UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— X   ECF CASE

LAKITA STEEL,

                                  Plaintiff,                COMPLAINT

      -against-

NORTHWELL HEALTH, INC., and,
JANICE VETRANO, Northwell Director of Operations,
Department of Orthopedic Surgery at
Long Island Jewish Hospital,

                           Defendants.         JURY TRIAL
                                              REQUESTED

———————————————————— X

Plaintiff LaKita Steel, as and for her complaint against Northwell Health, Inc.
and Janice Vetrano, individually and as Director of Operations in the
Department of Orthopedic Surgery at Northwell's Long Island Jewish Hospital
in New Hyde Park, New York, by and through her counsel, Robert B. Davis,
alleges as follows:

## NATURE OF ACTION

1.      Plaintiff LaKita Steel ("Plaintiff" or "Steel") brings this case seeking
redress against defendants Northwell Health, Inc. ("Northwell"), and
Janice Vetrano ("Vetrano"), individually and as Director of Operations in
the Department of Orthopedic Surgery at Northwell's Long Island Jewish
Hospital, for employment discrimination based on her race as a Black

African American and familial status as a single parent of an elementary
school aged son.

## JURISDICTION

2.  This is an action for monetary, declaratory and injunctive relief,
    backpay, front pay, emotional distress damages, statutory damages,
    punitive damages, prejudgment and post-judgment interest, and the
    reasonable attorneys' fees and costs of prosecuting her employment law
    claims. This action arises under 42 U.S.C. §1981, as amended, Title VII of
    the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), et seq.,
    and the New York Human Rights Law, to wit, Article 15 of the New York
    Executive Law §290, et seq., as amended.

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C §1331.
    Declaratory and injunctive relief are sought pursuant to 28 U.S.C. §2201
    and §2202.  Plaintiff also invokes the supplemental jurisdiction of the
    court pursuant to 28 U.S.C. §1367.

## ADMINISTRATIVE HISTORY

4.  On December 17, 2021, LaKita Steel filed an administrative complaint of
    discrimination against Northwell Health, Inc. and Janice Vetrano, with
    the Nassau County Commission on Human Rights.

5.      Steel's complaint alleged she had been and continued to be
        discriminated against on the basis of her race/color, national origin,
        familial status and retaliation.

6.      On July 14, 2022, the New York State Division of Human Rights ("State
        Division" issued its *"Determination after Investigation"* finding that
        probable cause exists to believe that the Respondents have engaged in
        the unlawful discriminatory practice LaKita Steel had complained of.

7.      The State Division assigned this matter to an administrative law judge to
        conduct a public hearing.

8.      Steel requested an administrative convenience dismissal of her claims
        from the State Division of Human Rights to pursue those claims in federal
        court.

9.      The February 20, 2024 *"Recommended Order of Dismissal for
        Administrative Convenience"* by the Administrative Law Judge assigned
        to conduct the public hearing, was adopted and issued by the New York
        State Division of Human Rights by Notice and Final Order dated
        February 21, 2024.

## *VENUE*

10.     Venue is proper within this district pursuant to Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §2000(e), et seq. and
28 U.S.C. §1391(b) as all acts complained of took place in the State of
New York and Northwell Health, Inc. operates facilities and offices in
New York City.

## *PARTIES*

11.     At all times relevant, LaKita Steel was an employee of Northwell Health,
Inc., working at Long Island Jewish Medical Center, which is located at
270-05  76th Avenue in New Hyde Park, New York.

12.     Long Island Jewish Medical Center ("LIJ") is a Northwell Health Inc.
("Northwell") facility.

13.     Defendant Northwell is a domestic company lawfully incorporated in the
State of New York.

14.     Northwell's head offices are located at 2000 Marcus Avenue, New Hyde
Park, New York.

15.     At all times relevant to this action Northwell has employed more than
five hundred people.

16.     At all times relevant, defendant Janice Vetrano has been an employee of
Northwell Health, Inc. working at LIJ as the Director of Operations in its
Department of Orthopedic Surgery.

17.   Defendant Northwell is an employer within the meaning of 42 U.S.C.
      §2000(e), et seq., of the Civil Rights Act of 1964, as amended.

18.   Defendant Northwell is an employer within the meaning of the New York
      Human Rights Law, Article 15, Section 292.


## FACTS


19.   LaKita Steel was born and raised in the United States of America.

20.   At all times relevant LaKita Steel has resided and continues to reside in
      New York State.

21.   In 2012, Steel received a bachelor's degree in business with a minor in
      mass communications from St. John's University in Queens, New York.

22.   In 2015, Steel received a master's degree in public relations from Full
      Sail University in Winter Park, Florida.

23.   Steel is now working remotely towards a doctoral degree in human
      services with a specialization in leadership and organizational
      management from Capella University in Minnesota.

24.   In November 2008, Steel commenced her employment with Northwell.

25.   At hire, Steel's job at Northwell was as a part-time receptionist working
      weekends.

26.   In or about 2013, Steel moved to the Accounts Receivable Department
      where her job title was Accounts Receivable Clerk.

27.   In or about August 2015, after Steel requested and Northwell granted
      her an accommodation after she underwent a surgical procedure.

28.   In or about August 2015, Steel moved her into a non-union position as
      Billing Coordinator in Northwell's Don Monti Cancer Center in Lake
      Success, New York.

29.   In 2017, Steel resigned from her Northwell employment and went to
      work at Jamaica Hospital in Queens, New York. After working briefly at
      Jamaica Hospital, in July 2017 Steel returned to work at Northwell as a
      non-union Administrative Support Associate in the Department of
      Orthopedic Surgery at LIJ Hospital.

30.   Steel's annual salary at hire in July 2017 in the Orthopedic Surgery
      Department was $36,980.

31.   In July 2017, when Steel returned to work at Northwell, she reported
      directly to Janice Vetrano, Administrative Director of Orthopedic
      Surgery.

32.   Between 2017 and 2021, about seven Northwell staff including Steel
      reported to Vetrano.

33.   Vetrano had administrative duties for about twenty medical residents in
      Orthopedic Surgery.

34.   Between 2017 and 2021, except for Steel's first few months in the
      Orthopedic Surgery Department, Steel had been the only Black African
      American employee reporting to Vetrano.

35.  Steel's primary job duties working as Vetrano's assistant consisted of managing the schedules of medical residents and physicians, assisting with the residents' program, paperwork for grand rounds, maintenance of the total joint and hip surgical list, special projects, placing orders, filing, and answering phones.

## *Anti-Black Employment Discrimination:*

### *A.    Hostile Work Environment*

36.  LaKita Steel is a Black African American woman with some Native American ancestry.

37.  At all times relevant, Janice Vetrano, a white female, was in charge of the Department of Orthopedic Surgery at Northwell's LIJ Hospital and directly supervised Steel's employment.

38.  As of July 2017, Vetrano and Steel had daily contact with one another for the remainder of her Northwell employment.

39.  Steel and Vetrano worked closely together, with Steel's desk just outside of Vetrano's office door.

40.  In July 2017, Steel took the position vacated by Jasmine Lawrence, a Black African American woman. Lawrence told Steel that the reason she left the Orthopedics Department was that Vetrano was nasty to her. Lawrence also told Steel that Vetrano had been compiling a case against her by putting false information in her file in an effort to get her fired from Northwell.

41.    In the first few months that Steel reported to Vetrano in 2017, there was
       one other Black African American employee reporting to Vetrano,
       Darlene Scott. At that time Scott worked as a clerk typist in
       Orthopedics.

42.    Steel heard Vetrano yelling at Scott on several occasions.

43.    Upon information and belief, Darlene Scott left her job at least partly
       because of Vetrano's disrespectful treatment of her.

44.    After Darlene Scott walked out on Vetrano, Vetrano said that she would
       make sure Darlene never gets a job here again.

45.    In the spring or summer of 2018, without offering a reason, Vetrano
       ordered Steel to let her know whenever she left her desk and each time
       she went on break or even to the restroom, by email or telling her
       directly.

46.    After a few weeks of complying with Vetrano's unnecessary harassing
       and monitoring directive, Steel stopped reporting her whereabouts
       unless she intended to leave the hospital premises.

47.    Steel overheard Vetrano inform some of the Physician Assistants that she
       had *"the power"* to fire PA James Mannix anytime she wanted.

48.    At all times relevant, LaKita Steel has been a single mother raising three
       sons who are all Black African American.

49.  In July 2019, Steel was at her desk speaking with Vetrano's supervisor,
     Northwell VP Michael Langino and Director of Research Sariya Ramoutar-
     Persaud. They were discussing Steel's child-care issues. At that time
     Steel's (youngest) son was about to turn seven-years of age. Steel
     described problems coordinating her son's summer camp schedule, her
     own work schedule, and her difficulties getting child-care coverage.
     These issues taken together caused her to be late picking up her son
     from camp, which produced daily late fees.

50.  That same day in July 2019, Langino offered to help Steel and said he
     would speak with Vetrano about shifting her summer schedule to avoid
     being late for work. Vetrano was not at work that day.

51.  Upon information and belief, the following week Langino met with
     Vetrano. After that meeting Langino informed Steel that he had
     approved her work schedule change to accommodate her son's summer
     camp schedule and child-care needs.

52.  After Langino left the Orthopedics office, Vetrano stormed out of the
     office without speaking with Steel. Afterwards Vetrano yelled in anger at
     Steel that she believed it helped her to go over Vetrano's head. Steel
     asked to close Vetrano's office door so no one else would hear her
     tirade. Vetrano refused and made it clear to Steel that she did not agree
     with the schedule adjustment. Vetrano admonished Steel that the
     following summer she would have to find an alternative to camp for her

son. Finally, Vetrano complained that she had been forced by Langino to abide by the temporary schedule change.

53.    Steel reported this round of Vetrano hostilities to Langino.

54.    Steel's younger son had drawn a picture and given it to Vetrano who hung it on a wall in her office. On the same day Vetrano yelled at Steel about Langino changing her summer schedule, Steel found her son's drawing in Vetrano's garbage pail. Steel viewed the discarded drawing as a message expressing Vetrano's continuing upset with her for going over her head to get Langino's approval of the summer schedule change.

55.    On or about July 3, 2019, Steel placed a food order for grand rounds in Orthopedics. Rounds were later cancelled. Vetrano left a voice-message with Steel to cancel the food order but by that point it was too late to cancel because the store had already closed. Later Steel found the food order receipt placed on her desk with a hand-written note criticizing her as if Steel had purposefully done this. Steel believed Vetrano was building a case against her and reported the matter to Northwell VP Michael Langino. Langino told Steel not to worry about it. Steel took that to mean Langino would discuss the matter with Vetrano.

56.    Northwell spine surgeon Dr. Jeff Silber and his wife had three Pomeranian dogs who were photographed in the Cohen's Children Hospital lobby, within LIJ. This occurred in 2020 during "Nurses Week" or month, which was when the Black Lives Matter protests set off by George Floyd's murder by police in Minneapolis began. Vetrano showed

Steel the photos on her cell phone. Vetrano and Steel then discussed the Pomeranian dogs. There was a white one, a black one and a brown one. Steel commented to Vetrano that all three dogs were gorgeous but wondered how to keep the white Pomeranian clean. Vetrano replied saying that her favorite dog was the black one because *"black lives matter"* and started laughing as if that was hilarious. This was the first time Steel heard Vetrano make an expressly anti-Black comment.

57.   Steel needed Vetrano's permission to take career development courses at Northwell.

58.   Early in 2020, Steel asked Vetrano to approve her taking an introduction to project management course and a course on developing leadership skills. Vetrano turned her down on both courses.

59.   On or about February 11, 2021, Steel had pulled up to parallel park into a spot on the street in front of Cohen's Children Hospital. At that moment, a white female driver sped and pulled up next to Steel's car. The other driver was wearing a Northwell employee badge and scrubs indicating she worked at Cohen's Children Hospital. The driver claimed she was taking the spot. Steel objected because when she pulled up to parallel park the other woman had been down the block and then sped up next to Steel's car. This offending Northwell/Cohen Children's Hospital staff member called Steel a *"a fucking Black bitch*!" Steel did not know the staff member's name. Steel let her have the parking spot.

60.    Steel was so upset by the racist attack parking incident that she told
       some co-workers who then told Vetrano.

61.    Several department staff advised Steel to report the parking incident to
       then Executive Director Michael Goldberg. However, Vetrano told Steel
       that the street where the incident occurred is not on Northwell
       property. The NP's present said Steel should still report the incident
       because Northwell should know that one of their employees was being
       racist to another employee. Vetrano showed no empathy or support for
       Steel after hearing of this incident. Rather, in a serious tone, Vetrano
       advised Steel that she wouldn't report the incident to HR, admonishing
       her, *"you wouldn't want to rock the boat."* It was disturbing to Steel
       that her supervisor's immediate response to being called a
       racist/misogynist slur by a hospital employee was to sweep it under the
       rug.

62.    By late May 2021, around the first anniversary of the police murder of
       George Floyd in Minneapolis, Department and the staff had returned to
       work in the office full-time. One day on her way to the office bathroom,
       Steel saw Vetrano in the Physician Assistant/Resident Room speaking
       with two Physician Assistants. The television was on to a news report
       about Floyd's murder. While in the adjoining bathroom Steel heard
       Vetrano yell complaining that *"they're still talking about George Floyd –
       nobody cares - nobody fucking cares!"* Vetrano was positioned only a few
       feet from the open doorway. Vetrano would have likely noticed the only

Black person in the office walking past the doorway on her way to the bathroom. Vetrano would have been aware she would be overheard by Steel. Afterwards Steel met one of the Physician Assistants who had been with Vetrano and confirmed what Vetrano said. That PA had been visibly disturbed by the comment and told Steel that Vetrano had been getting to her.

63.  As a Black African American mother of three Black sons, LaKita Steel was disturbed at her boss's expression of disdain for the value of George Floyd's life and its significance for the civil rights of Black African Americans.

64.  The only time that Vetrano complimented Steel's hair was when she wore a wig of white textured hair. Vetrano never remarked upon or complimented Steel when she wore her natural or more coarse hair such as when she braided her hair or wore faux locks. Steel took these isolated incidents to express Vetrano's preference for hair styles/hair textures associated with white women's hair even though Steel is a Black woman.

65.  In October 2021, all the first-year residents in Orthopedics were submitting photographs for posting within the Northwell network. One such resident was Dr. Claire Isabelle Verret, PGY-1, who is a Black woman of Haitian descent. Dr. Verret asked that some of the PGY1 residents submit better quality photos as some were too pixelated. Vetrano asked Steel to look at Dr. Verret's new photo which showed her

with her Afro-textured hair flared out. At seeing this photo Vetrano commented in horror words to the effect of oh my god – her hair looks awful. Steel replied, asking what's wrong with her hair – I love it – it's her real hair – it's her natural hair. Vetrano insisted that she just didn't like it and didn't think it looked professional.

66.    Steel was disturbed by her supervisor's horrified reaction at seeing a Black woman with a natural or Afro hairstyle that did not reflect the hairstyles of non-Black (white) women such as Vetrano. This incident made Steel tremble.

67.    In November 2021 Steel reported Vetrano's hair comment to Human Resources at Northwell in an email to HR staff Melissa Bouganza. This led to HR's investigation of Steel's complaint of Vetrano's racially discriminatory treatment.

68.    Steel saw Vetrano yell at PA Raquel Westerdahl about a patient complaint to the point that Westerdahl was in tears. Westerdahl is Puerto Rican and complained to Vetrano that Vetrano doesn't back up her staff.

69.    From time-to-time Vetrano shared uninvited details of her sex life with Steel and other Northwell staff which made Steel very uncomfortable as she felt compelled to put up with that since Vetrano was her boss.

70.    Due to their strained relationship, Steel began to avoid having lunch in the hospital cafeteria to limit her contact with Vetrano.

71.   Upon information and belief, in August 2021, Vetrano took Northwell's course *"Introduction to Unconscious Bias."* After having taken that course Vetrano continued to subject Steel to a hostile work environment.

72.   Upon information and belief, in 2022, at the conclusion of Human Resource's investigation into Steel's internal discrimination complaint, Northwell required Vetrano to take courses entitled, *"Respectful Work Environment – Discrimination and Sexual Harassment Prevention,"* and complete course work on *"Emotional Intelligence: An Introduction."*

73.   In 2019, Kathy Sullivan was hired as a new clerk typist in Orthopedics. Sullivan was Vetrano's best friend's sister-in-law. Upon information and belief, Vetrano hired Sullivan without administrative experience and without an interview.

74.   Sullivan was not qualified for this position as Steel had to teach her how to send, receive and scan electronic mail, how to use the office fax machine as well as how to use Excel on a basic level. Sullivan told Steel that her background before her Northwell hire was as a teacher's aide watching children on their lunch breaks.

75.   In or about August 2021, Steel asked Vetrano to let her continue to work remotely to accommodate her 9-year-old son's school being conducted remotely. Steel's Northwell work schedule was 9 am – 5 pm Monday through Friday. Steel asked to be able to leave work twice a week at 3 pm with a commensurate cut in pay. This was to be able to pick her

son up from school and avoid having him get home and be home unsupervised. Steel's son had severe asthma and his private caretaker, his grandmother, and their neighbor, who had all watched him, had all recently passed away. The school had neither before nor after school programs and Steel couldn't afford a new sitter.

76.    One result of Vetrano's refusal to accommodate the schedule change Steel requested was that her asthmatic son would likely be home alone unattended. In addition to coming home from school through a rough neighborhood was the risk that a neighbor could report her child being temporarily unattended to Child Protective Services which would put her at risk of losing custody of her child. This was a tremendous stressor and cause for concern for Steel.

77.    Vetrano refused this requested scheduling modification insisting Steel had to be present in the office. This was based on a fiction because the Department didn't get visitors. Grand rounds were attended by residents, physicians, orthopedic administrators. None of whom needed to be greeted. Patients did not come to their office. Moreover, Kathy Sullivan was in the office at those times.

78.    Shortly after declining Steel's request to work from home, Vetrano granted Sullivan's request to work remotely to accommodate her having sold her home in Queens and relocated to her home with her dog in the Hamptons. At that time Sullivan had told Steel that her children were in their twenties. Upon information and belief, Vetrano commented about

accommodating Sullivan working remotely and in contrast to Steel, that *"Kathy is worth it."* Kathy Sullivan is a white woman.

79.     Around the time that Vetrano turned down Steel's request to work remotely from home, Vetrano asked Steel to copy papers she had handed her. The papers indicated that Physician Assistant Emily Sombke's request for an extension of her leave of absence for child-care issues had been granted. Sombke, who happens to be white, had her leave extension approved by Vetrano.

80.     Vetrano commented to Steel about an LIJ surgeon Katie Nellans who is gay and married. Vetrano asked Steel whether she had seen a photograph of Nellans with her wife and children. Vetrano commented, *"[w]hich one is the man because Naomi carried but Katie carried too – I would think Katie is the man because she dresses more masculine."*

81.     On several occasions Steel heard Vetrano refer to Dr. Katie Nellans as a *"bitch."*

82.     Upon information and belief, in the fall of 2020, a physician of color at Long Island Jewish Hospital, committed suicide by jumping off the hospital parking garage. Evidently in part because it happened on the physician's day off, Vetrano reacted to this tragic event by commenting to the effect, *"he could have done this anywhere – he's a doctor - why would he come here and do that to us –  he makes good money?"* Steel helped organize classes attended by the physician's patients. Steel was sickened by Vetrano's heartless reaction to this tragedy.

83. Steel complained to several Northwell employees about pay disparities, and about the racially hostile work environment that Vetrano had subjected her to.

84. Steel discussed race discrimination at Northwell with Amirah McIntosh, Crystal Dutchin, Claudene Williams, Christina Biamby, Vincent, Cindy, and Tasha (the last names of these last three individuals are not known to Steel). These Northwell staff members are all people of color. In addition, Steel discussed race discrimination at Northwell with Elizabeth Cera, a Hispanic woman.

85. It was clear to Steel that Vetrano had license to say and do whatever she pleased at Northwell.

86. The workplace atmosphere made it evident to Steel that complaining to management about racially offensive treatment would be futile.

87. LaKita Steel has been denied the equal benefits, privileges and conditions of employment at Northwell as were enjoyed by employees who are not Black African American. This racially disparate treatment was motivated at least in part by Steel's race and color.

88. During her Northwell employment, LaKita Steel had been subjected to inferior terms and conditions of employment relative to employees who are not Black African American. This disparate treatment was motivated at least in part by Steel's race and color.

**Anti-Black Employment Discrimination:**

### B. Opportunities for Promotion Blocked by Vetrano

89.     In September 2019, LaKita Steel applied and was interviewed for an
Administrative Support Supervisor position at Zucker Hillside Hospital
within the Northwell network. One of the interviewers, Jennifer
McKelvey asked for the name of Steel's supervisor. The interview
seemed to go great. After the interview, McKelvey and a psychiatrist
who sat in on the interview, gave Steel a tour of the Department. Steel
was well-qualified for this position.

90.     Jahleel Felix, a talent acquisition specialist at Northwell, told Steel she
didn't get the 2019 Administrative Support Supervisor position at Zucker
Hillside Hospital. Felix further informed Steel that McKelvey had said
that Steel did not want to work with patients. Upon information and
belief, the source of that damaging falsehood was Janice Vetrano.

91.     Upon information and belief, the 2019 Administrative Support Supervisor
position at Zucker Hillside was in the salary range of approximately
$65,000 to $80,000.

92.     In or about December 2019, Steel applied for a position within Northwell
as Administrative Support Supervisor in the Outpatient/Family Practice
in Lynbrook. Steel was well-qualified for this position and it would have
shortened her work commute. The second interview for this position was
with the Director of that practice, Romain Singh, who offered to and
showed Steel around the office after the interview. Steel believed she

would be offered this position but was not.  Steel believes that false
negative feedback from her supervisor Janice Vetrano was the likely
cause of her being denied this position.

93.     In the spring of 2021, a position as GME Training Program Administrator
in LIJ's Department of Surgery was posted. That position involved the
medical resident program, a population Steel had already worked with.
Steel was well-qualified for this position as she had already been doing
some of the work attached to that position. Steel applied and was
interviewed twice for the position. Interviewers at the two interviews
indicated she had interviewed well. One of the people who interviewed
her was Gabrielle Grubman, Manager of LIJ's Department of Surgery.

94.     After Steel applied for the GME Training Program Administrator job in
the Spring of 2021, on May 18, 2021, for the first time that Steel was
aware of, Gabrielle Grubman came to the Operations office and spoke
with Vetrano. After Grubman left, Vetrano came out of her office with a
hostile attitude and avoided Steel. Later that day when Steel asked
Vetrano whether Kathy Sullivan had completed an assignment, Vetrano
yelled at her. Steel then declined to attend a second interview with
Vetrano as it was clear that Vetrano would ensure she would not be
offered that position. Steel later reported these events to HR.

95.     The spring 2021 GME Training Program Administrator position in Surgery
        would have been a promotion. Even though Vetrano worked closely with
        Steel on a daily basis, she chose not to tell Steel about this job opening.
        Steel eventually learned of and applied for the position. Steel was
        interviewed by Michael Langino and Vetrano. During the interview,
        Vetrano commented that this position was too much work in a tone to
        dissuade Steel from pursuing the position. Steel was not offered this
        position.

96.     Upon information and belief, if Steel had been promoted to the GME
        Training Program Administrator position in Orthopedics in 2021 her pay
        would have increased from the low forty thousand dollar range to the
        salary range listed on Indeed as $58,500 - $75,012. This pay increase
        would have enabled Steel to pay for the child care her son needed.

97.     In the spring of 2021, Steel learned there was an opening for another
        position in Orthopedics that was not posted and that Vetrano had not
        informed her of.

98.     Vetrano's awareness of the low salary Steel was earning was reflected in
        comments Vetrano made when Steel wore high end shoes to work to the
        effect of "how can you afford those?" Those comments expressed
        Vetrano's insensitivity to Steel's dignity, privacy and Vetrano's own
        culpability in keeping Steel stuck in a low-paid position. Steel never
        heard Vetrano make similar comments to other staff in the Orthopedic
        Surgery Department.

99. Based on the facts stated herein, it was evident to Steel that Vetrano had and continued to block and undermine the advancement of her career.

100. Janice Vetrano initiated, engaged in, aided, abetted and condoned the racially discriminatory treatment LaKita Steel had been subjected to at Northwell.

101. Northwell and Janice Vetrano caused and/or exacerbated her anxiety, panic attacks, depression, asthma/breathing difficulties, shaky hands, crying, insomnia, migraine headaches, appetite/weight fluctuation, and hair loss.  Discriminatory conditions have caused Steel to become increasingly withdrawn and socially isolated.

102. By the fall of 2021, LaKita Steel could no longer tolerate the hostile work environment long sustained by Janice Vetrano who had worked to keep her under her thumb stuck in an underpaid position subjected to racially infused abusive treatment.

103. In December 2021, Steel filed a complaint of employment discrimination with the Nassau County Commission on Human Rights.

104. LaKita Steel's last day working at Northwell was in December 2021.

105. In January 2022, Steel requested and went on a leave of absence that for several months, included benefits and partial pay.

106. Steel sought both to ameliorate the impact of the hostile workplace conditions detailed herein and continued her search for work away from Vetrano, both within the Northwell network and outside it.

107.   Steel continued to search and apply for work.

108.   On May 10, 2024, Steel formalized her de facto resignation from her leave of absence/employee status at Northwell Health, Inc.

109.   Steel has lost pay due to Vetrano's discriminatory treatment and blocking her promotion.

110.   The racially hostile work environment, inclusive of Vetrano's undermining Steel's search for higher paying work, was so oppressive and intolerable that Steel could not and did not return to work at her Northwell job after December 2021.

111.   The conditions detailed herein constitute a discriminatory constructive discharge from LaKita Steel's Northwell employment.

### AS AND FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. §1981 - Employment Discrimination )

112.   Plaintiff LaKita Steel repeats and realleges each and every allegation contained in paragraphs 1 through 111 as though set forth in their entirety below.

113.   The acts, practices and policies of Defendants Northwell Health Inc. and Janice Vetrano, as detailed above, have violated Plaintiff LaKita Steel's rights as a Black African American to the enjoyment of all rights, benefits, pay, privileges, terms and conditions of her contractual relationship with Northwell as are enjoyed by White citizens, all in violation of 42 U.S.C. §1981.

114.    Defendants' actions have resulted in Plaintiff being subjected to a
hostile work environment motivated by anti-Black racist animus in
violation of 42 U.S.C. §1981.

115.    Defendants' actions have resulted in Plaintiff being subjected to
discrimination in promotion and other job opportunities, and the denial
of salary commensurate with Plaintiff's level of job duties, work
performance, skill, experience and accomplishment, all on the basis of
her race and color in violation of 42 U.S.C. §1981.

116.    Defendants' actions have resulted in Plaintiff's constructive discharge
which was motivated by anti-Black racist animus in violation of 42 U.S.C.
§1981.

117.    Defendants retaliated against Plaintiff for having reported discriminatory
treatment at Northwell on the basis of her race and color in violation of
42 U.S.C. §1981.

118.    Defendants were either aware of, should have been aware of, or were
protagonists in the unlawful discriminatory treatment of Plaintiff and
conditions she was subjected to, all in violation of 42 U.S.C. §1981.

119.    Plaintiff seeks an order of this court declaring that Defendants have
violated rights secured to Plaintiff under 42 U.S.C. §1981.

120.    Plaintiff seeks compensatory damages for the hostile work environment
and its harmful impact on her emotional well-being, constructive
discharge, lost pay, and punitive damages, all for the violation of rights

secured to her under 42 U.S.C. §1981, together with reasonable attorney's fees and costs as prevailing party.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Title VII – Employment Discrimination)

121.    Plaintiff LaKita Steel repeats and realleges each and every allegation contained in paragraphs 1 through 120 as though set forth in their entirety below.

122.    The acts, practices and policies of Defendants Northwell Health Inc. and Janice Vetrano, as detailed above, have violated Plaintiff's rights as a Black African American to be free from discrimination in employment based on her race and color, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000€, et seq.

123.    Defendants' actions and failures to act resulted in LaKita Steel being subjected to a racially hostile work environment, promotional opportunities denied or foreclosed, the denial of salary commensurate with plaintiff's level of job duties, work performance, skill, experience and accomplishment and her constructive discharge, all of which were motivated by her race and color as a Black African American woman.

124.    The unlawful conduct as detailed herein caused LaKita Steel harm and injury in the form of emotional distress, mental humiliation and anguish, physical harm, damage to her career, and the continuing loss of wages and employee benefits.

125. Plaintiff seeks an order of this court declaring that Defendants have violated rights secured to Plaintiff under Title VII as amended.

126. Plaintiff seeks compensatory damages for the hostile work environment and its harmful impact on her emotional well-being, constructive discharge, back and front pay, and punitive damages, all for the violation of rights secured to her under Title VII as amended, together with reasonable attorney's fees and costs as prevailing party.

### AS AND FOR A THIRD CAUSE OF ACTION
### (N.Y. Human Rights Law - Employment Discrimination)

127. Plaintiff LaKita Steel repeats and realleges each and every allegation contained in paragraphs 1 through 126 as though set forth in their entirety below.

128. The acts, practices and policies of Defendants Northwell Health Inc. and Janice Vetrano, as detailed above, have violated Plaintiff's rights as a Black African American and a single parent to be free from discrimination in employment based on her race and color, and familial status, all in violation of Article 15 of the Executive Law of the State of New York, also known as the New York State Human Rights Law ("SHRL").

129. Defendants were either aware of, should have been aware of, condoned, or were protagonists in the unlawful discriminatory and retaliatory treatment of Plaintiff, all in violation of the SHRL.

130.   Defendants' actions have resulted in Plaintiff being subjected to a
       hostile work environment and the denial of salary commensurate with
       Plaintiff's level of job duties, work performance, skill, experience and
       accomplishment, motivated by racist animus and familial status.

131.   Plaintiff seeks compensatory damages for the hostile work environment
       and its harmful impact on her emotional well-being, in addition to lost
       pay, and punitive damages, all for the violation of rights secured to her
       under the New York Human Rights Law, together with reasonable
       attorney's fees and costs as prevailing party.

132.   Defendants' actions have resulted in Plaintiff being subjected to
       discrimination in promotion and other job opportunities on the basis of
       her race, color and familial status, all in violation of the New York State
       Human Rights Law.

133.   Plaintiff seeks an order of this court declaring that Defendants have
       violated rights secured to Plaintiff under the SHRL.

## *DEMAND FOR RELIEF*

WHEREFORE, Plaintiff LaKita steel respectfully requests that this Court enter

judgment against Defendants Northwell Health Inc., and Janice Vetrano

as follows:

A.  A finding that defendants Northwell Health Inc., their agents and assigns, and Janice Vetrano, intentionally discriminated against plaintiff LaKita Steel in violation of 42 U.S.C. §1981;

B.  A finding that defendants Northwell Health Inc., their agents and assigns, and Janice Vetrano, intentionally discriminated against plaintiff LaKita Steel in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), et seq.;

C.  A finding that defendants Northwell Health Inc., their agents and assigns, and Janice Vetrano, intentionally discriminated against plaintiff LaKita Steel in violation of the New York State Human Rights Law, §296 of the New York State Executive Law;

D.  An award in favor of plaintiff LaKita Steel and against defendants Northwell Health Inc. and Janice Vetrano, for lost pay, compensatory and punitive damages, all for violations of her rights under 42 U.S.C. §1981;

E.  An award in favor of plaintiff LaKita Steel and against defendants Northwell Health Inc. and Janice Vetrano, for lost pay, compensatory and punitive damages, all for violations of her rights under Title VII of the Civil Rights Act of 1964, as amended;

F.  An award in favor of Plaintiff LaKita Steel and against defendants Northwell Health Inc. and Janice Vetrano, for lost pay, compensatory and punitive damages, for violations of her rights under the New York State Human Rights Law;

G.  An award in favor of Plaintiff LaKita Steel and against defendants Northwell Health Inc. and Janice Vetrano, for prejudment and postjudgment interest, together with Plaintiff's reasonable attorney's fees and costs of this proceeding pursuant to 42 U.S.C. §1988, and/or under the New York Human Rights Law; and

H.  For such other and further relief in favor of LaKita Steel against Northwell Health Inc. and Janice Vetrano.

## *JURY DEMAND*

Plaintiff LaKita Steel hereby requests a trial by jury on all claims so triable.

Dated:       July 9, 2024
             New York, New York

Robert B. Davis
Attorney for Plaintiff LaKita Steel
233 Broadway, Suite 2704
New York, New York  10279
phone: 212.477.4777
email: robert@rbdavislaw.com